**GABRIELLI LEVITT LLP**
Michael J. Gabrielli
michael@gabriellilaw.com
2426 Eastchester Road, Suite 201
Bronx, New York 10469
Telephone: (718) 708-5322
Facsimile: (718) 708-5966

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TERESA RODRIGUEZ, individually and on behalf of other similarly situated individuals,<br><br>       Plaintiff,<br><br>v.<br><br>SAZERAC COMPANY, INC. d/b/a STIRRINGS,<br><br>       Defendant. | Case No. 2:24-cv-08206-RER-ST<br><br>**CLASS ACTION<br>AMENDED COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

  Teresa Rodriguez, a New York resident ("Plaintiff"), individually and on behalf of other similarly situated individuals, alleges the following Class Action Complaint against Defendant, Sazerac Company, Inc. d/b/a Stirrings ("Sazerac" or "Defendant"), upon personal knowledge as to herself and her own acts and upon information and belief as to all other matters, based upon, inter alia, the investigation made by her attorneys – as to all other matters, as follows:

**INTRODUCTION**

  1. This is a consumer protection action seeking redress for, and a stop to, Defendant's unfair and deceptive practice of advertising and marketing of its line of cocktail mixers (the "Products" or "Product") that are sold under the "Stirrings" brand name with representations that the Products contain "No Preservatives."[1]

  2. Specifically, the Products include, but are not limited to, Stirrings Margarita Cocktail Mix, Stirrings Old Fashioned Mix, Stirrings 5 Calorie Margarita Mix, Stirrings Paloma Mix, Stirrings Blood Orange Cocktail Mix, Stirrings Peach Bellini Mix, Stirrings Cosmopolitan Mix, Stirrings Apple Cocktail Mix,

---

[1] *See*, **Exhibit A**, annexed hereto.

Stirrings Lemon Drop Cocktail Mix, Stirrings Bloody Mary Mix, Stirrings Pomegranate Cocktail Mix, Stirrings Sour Mix, Stirrings Mule Mix, Stirrings Mai Tai Mix, and Stirrings 5 Calorie Cosmopolitan Mix.[2]

3. Defendant's "No Preservatives" representations are false, deceptive and misleading because the Products contain the synthetic preservative, citric acid.[3] This labeling deceives consumers into believing that they are receiving healthier, preservative-free cocktail mixers even though these Products cannot live up to these claims.

4. Consumers rely on Defendant's labeling and advertising of the Product as containing "No Preservatives" to be truthful and would not know that the Products actually contain preservatives.

5. Reasonable consumers such as Plaintiff do not have specialized knowledge necessary to identify ingredients in the Products as being inconsistent with Defendant's advertised claims of the Products containing "No Preservatives."

6. Conscious of consumers' increased interest in more nutritious foods free of additives, and their willingness to pay more for products perceived to meet these preferences, Defendant misleadingly, illegally and deceptively seek to capitalize on these consumer health trends.

7. Plaintiff and those similarly situated ("Class Members") relied on Defendant's misrepresentations that the Products contain "No Preservatives" when purchasing the Products. Plaintiff and Class Members paid a premium for the Products over comparable products that did not purport to contain "No Preservatives." Given that Plaintiff and Class Members paid a premium for the Products based on Defendant's misrepresentations that they contain "No Preservatives," Plaintiff and Class Members suffered an injury in the amount of the premium paid.

8. Defendant's conduct violated and continues to violate New York General Business Law §§ 349 and 350. Defendant breached and continues to breach their express warranties regarding the Products. Accordingly, Plaintiff brings this action against Defendant on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

**JURISDICTION AND VENUE**

9. This Court has original jurisdiction over the claims asserted herein individually and on behalf of the Class pursuant to 28 U.S.C. §1332, as amended in 2005 by the Class Action Fairness Act. Subject matter jurisdiction is proper because: (1) the amount in controversy in this class action exceeds

---

[2] Discovery may demonstrate that additional Stirrings products are within the scope of this Complaint.

[3] *See*, **Exhibit B**, annexed hereto.

$5,000,000, exclusive of interest and costs; and (2) a substantial number of the members of the proposed class are citizens of a state different from that of Defendant, a corporate entity having a principal place of business in Louisville, Kentucky.

10. This Court has personal jurisdiction over Defendant because it regularly conducts business in this District and purposefully avails itself of the laws of New York to market, promote, distribute, and sell the Products to consumers in New York and this District. Defendant engages in the wrongdoing alleged in this Complaint throughout the United States, including New York State. Defendant is authorized to do business in New York State, and Defendant has sufficient contacts with New York and/or otherwise has intentionally availed itself of the markets in New York State, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant engages in substantial and not isolated activity within New York State.

11. Venue is proper in this District under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District.

## PARTIES

12. This is a nationwide consumer class action brought by Plaintiff on behalf of all individuals who purchased the Products for personal use and not for resale.

13. During the relevant period, Class Members in New York and throughout the United States purchased the Products online and through numerous brick and mortar retail locations. Plaintiff and Class Members suffered an injury in fact caused by the false, fraudulent, unfair, deceptive, and misleading practices set forth in this Complaint.

14. Plaintiff is a resident of Nassau County, New York. She purchased the Defendant's Products on numerous occasions at a Kings Food Market located in Garden City, New York, during the three years preceding the filing of this Complaint.

15. Plaintiff purchased Defendant's Products because she saw the labeling, advertising, and website information, which represented that the products contained "No Preservatives." She relied on Defendant's false, misleading, and deceptive representations that the products contained "No Preservatives." Had she known the truth—that the representations she relied upon in making her purchases were false, misleading, and deceptive—she would not have purchased the Products at a premium price.

16. Defendant's statements are false and misleading to a reasonable consumer because, as set forth more fully herein, the Products contain the preservative, citric acid.

17.  If Defendant's products were reformulated such that its representations were truthful, Plaintiff would consider purchasing Defendant's products in the future.

18.  Defendant, Sazerac, is a corporation with its principal place of business in Louisville, Kentucky. Defendant manufactures, markets, and distributes the Products throughout the United States. Defendant created and/or authorized the false, misleading and deceptive advertisements, packaging and labeling for the Products.

## SUBSTANTIVE ALLEGATIONS

### Defendant's "No Preservatives" Representation Is False and Misleading to a Reasonable Consumer

19.  Defendant misleads consumers into thinking that the Products contain "no preservatives" with its false labeling claims to this effect. However, the Products actually contain citric acid, whose function as a synthetic preservative has been well-documented.

20.  Citric acid is a preservative as the term is defined by the Food and Drug Administration ("FDA") in 21 C.F.R. § 101.22(a)(5): "The term chemical preservative means any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties."

21.  Merriam-Webster defines 'preservative' as "something that preserves or has the power of preserving."[4] The Oxford English Dictionary similarly defines 'preservative' as "[a] thing which preserves or tends to preserve."[5]

22.  The scientific evidence and FDA statements cited below establish that citric acid tends to prevent or retard the deterioration of food products. This remains the case regardless of the subjective purpose for which this substance is added to the Product.

23.  Citric acid does not fall into any of the regulatory exemptions from the definition of a preservative.

24.  According to the FDA website, citric acid is listed in the category of preservatives used to "prevent food spoilage from bacteria, molds, fungi or yeast" and slows and "prevents changes in color, flavor,

---

[4] Preservative, Merriam-Webster, https://www.merriam-webster.com/.

[5] Preservative, Oxford English Dictionary, https://www.oed.com/.

or texture."[6] Citric acid is also listed for its effect of preventing spoilage and therefore, having a preservative effect.[7]

25. The following table from the FDA's website lists the types of common food ingredients, their functions, why they are used, and some examples of the names that can be found on product labels.[8] Some ingredients have multiple functions:

| Types of Ingredients | What They Do | Examples of Uses | Ingredient Names that May be Found on Product Labels |
|---|---|---|---|
| **Preservatives** | **Prevent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness** | Fruit sauces and jellies, beverages, baked goods, cured meats, oils and margarines, cereals, dressings, snack foods, fruits and vegetables | Ascorbic acid, **citric acid,** sodium benzoate, calcium propionate, sodium erythorbate, sodium nitrite, calcium sorbate, potassium sorbate, BHA, BHT, EDTA, tocopherols (Vitamin E) |
| **pH Control Agents and acidulants** | Control acidity and alkalinity, **prevent spoilage** | Beverages, frozen desserts, chocolate, low acid canned foods, baking powder | Lactic acid, **citric acid,** ammonium hydroxide, sodium carbonate |

26. Citric acid's classification as a preservative is further confirmed by a Warning Letter sent by the FDA to the manufacturer of Chiquita brand "Pineapple Bites with Coconut" and "Pineapple Bites," in which the FDA proclaimed the "Pineapple Bites" and "Pineapple Bites with Coconut" products are misbranded within the meaning of Section 403(k) of the Act [21 U.S.C. 343(k)] in that they contain the

---

[6] Types of Food Ingredients, FDA (July 6, 2023), https://www.fda.gov/food/food-additives-and-gras-ingredients-information-consumers/types-food-ingredients.

[7] *Id.*

[8] *Id.*

chemical preservatives ascorbic acid and *citric acid* but their labels fail to declare these preservatives with a description of their functions. 21 CFR 101.22."[9]

27. Citric acid's nature as a preservative is also acknowledged by insiders in the preservative manufacturing and distribution industries. For instance, FBC Industries, Inc. a manufacturer and supplier of FCC grade citric acid additives, acidulants, buffering agents and preservatives for the food and beverage industry, describes citric acid's function: "Citric acid is the most commonly used acidulant in the industry. As a food additive or food grade product, citric acid is used as a flavoring and preservative. The buffering properties of citrates are used to control pH and flavor."[10]

28. Citric acid acts as a preservative in the Products regardless of the subjective purpose or intent for why Defendant added citric acid to the Products, including, as a flavoring agent.

29. This is confirmed by Dr. Marc Meyers, a food scientist with a Ph.D., nearly thirty years, of experience in the field, multiple patents, and published work.[11]

30. Even if citric acid can be used as a flavoring agent in the Products, a greater amount of citric acid is needed to act as a flavoring agent than to preserve the Products because citric acid acts as a preservative even if very low levels are contained in the Product.[12]

31. The quantity of citric acid therefore needed to affect the flavor of the Product is more than sufficient to function as a preservative. Accordingly, even if Defendant's purported intent to use citric acid was for flavoring, this would have no bearing on the actual function of citric acid as a preservative.[13]

32. Citric acid functions as a preservative by serving as an acidulant and as an indirect antioxidant, by infiltrating and then weakening or killing microorganisms through direct antimicrobial effect

---

[9] *See*, Letter to Chiquita Brands Int'l, Inc. and Fresh Express, Inc., Archived FDA Warning Letters (2005-2012), https://web.archive.org/web/20211128074142/https://www.fdalabelcompliance.com/letters/ucm2 28663; *see also*, **Exhibit C**, annexed hereto.

[10] http://www.fbcindustries.com/Citric_Acid.aspx.

[11] *See*, **Exhibit D**, Declaration of Dr. Marc Meyers ("Meyers Decl.") ¶¶ 7-18.

[12] *See*, Meyers Decl., ¶¶ 9-10, 14-18.

[13] Id. ("Citric acid is effective at reducing spoilage organisms and pathogens at levels well below the usage rate of these preservatives in the Stirrings Cocktail Mixers Products. Levels as low as 0.03% citric acid were confirmed to have an effect on reducing growth or stopping growth of spoilage and pathogenic microorganisms. This is below the threshold (0.04%) for the sensory effect of only using enough Citric Acid 'For Flavor'").

lowering their pH-level and thereby combatting microorganisms, and through sequestration. Citric acid serves these functions regardless of whether they are also being used as flavorants.[14]

33. Citric acid still acts as a preservative even if it was intended to be used for another purpose. Food and beverage manufacturers, like Defendant, seek to provide consumers with products that are palatable within a given shelf life. To help ensure this, manufacturers impose many hurdles to degradation when formulating a product. Therefore, if an ingredient has a preservative effect, like citric acid, it is considered a preservative because it acts as a hurdle to food degradation regardless of whether it was added to the Product for other reasons.[15]

34. In fact, as far back as in April of 2010, the International Food Information Council ("IFIC"), acting in conjunction with the FDA, issued a public bulletin informing consumers wanting to avoid preservatives to check if the food's ingredients include the "chemical additive of citric acid," which the IFIC and FDA "designate as a preservative."[16]

35. Citric acid, as an ingredient, is required to be followed by a description of its function, so consumers can make informed choices, "e.g., 'preservative', 'to retard spoilage', or 'a mold inhibitor.'" 21 C.F.R. § 101.22(j).[17]

36. Citric acid is a chemical "that, when added to food, tends to prevent or retard deterioration thereof" and function in this capacity in the Product. 21 C.F.R. § 101.22(a)(5).

37. Citric acid is used in the Products as an acidulant, chelating agent, antimicrobial agent, buffering agent, antioxidant additive, and anti-browning agent.

38. As an acidulant, citric acid increases the acidity of the Product, which lowers its pH.

39. This creates conditions which inhibit microbial spoilage from bacteria, yeasts, and molds.

---

[14] *See*, Deman, John M. "Acids as food additives serve a dual purpose, as acidulants and as preservatives." Principles of food chemistry. AVI Publishing Co., Inc., 1999, p. 438.

[15] *See*, Biesta-Peters, E., et al. Comparing Nonsynergistic Gamma Models with Interaction Models To Predict Growth Of Emetic Bacillus Cereus When Using Combinations Of Ph And Individual Undissociated Acids As Growth-Limiting Factors. Applied and Environmental Microbiology, American Society for Microbiology, (2010), https://aem.asm.org/content/aem/76/17/5791.full.pdf.

[16] IFIC and FDA, April 2010 Bulletin: "Overview of Food Ingredients, Additives & Colors, at pp. 2-3, available at: https://www.fda.gov/files/food/published/Food-Ingredients-and-Colors-%28PDF%29.pdf.

[17] The Products' labels do not comply in this respect for the designation of a function of citric acid, inasmuch as there is no mention of its function as a preservative.

40. The addition of citric acid means that if any microorganisms survive processing and heat pasteurization, they will be neutralized, and the Product will be preserved by being stable and consumable for a longer period after it is first made, and after opened for consumption.

41. As an antimicrobial agent, the low pH of citric acid helps to prevent microbial growth, thereby preventing spoilage and preserving freshness.

42. As a buffering agent, citric acid helps to maintain a constant pH, preventing batch-to-batch inconsistencies in the Products.

43. The result of the constant pH is a product lasting longer on the shelves and after being opened, because it will be more stable and less prone to microbial spoilage.

44. As an antioxidant additive, citric acid is an oxygen scavenger and prevents oxidation, preventing rapid deterioration upon exposure to air or changes in storage conditions.

45. By representing the Products are free from preservatives, Defendant seeks to capitalize on consumers' preference for less processed products with no preservatives.

46. Indeed, "foods bearing 'free-from' claims are increasingly relevant to Americans, as they perceive the products as closely tied to health…84 percent of American free-from consumers buy free-from foods because they are seeking out more natural or less processed foods. In fact, 43 percent of consumers agree that free-from foods are healthier than foods without a free-from claim, while another three in five believe the fewer ingredients a product has, the healthier it is (59 percent). Among the top claims free-from consumers deem most important are trans-fat-free (78 percent) and preservative-free (71 percent)."[18]

47. Consumers are also willing to pay more for the Product with "no preservatives" because of the perceived higher quality, health and safety benefits associated with preservative-free foods. According to Nielsen's 2015 Global Health & Wellness Survey that polled over 30,000 people online, 80 percent of Americans are willing to pay more for healthier foods.[19] This, coupled with the fact that global sales of healthy

---

[18] *See*, Free-From Food Trends - US - May 2015, Mintel: World's Leading Market Intelligence Agency http://www.mintel.com/press-centre/food-and-drink/84-of-americans-buy-free-fromfoods-because-they-believe-them-to-be-more-natural-or-less-processed.

[19] *See*, We Are What We Eat: Healthy Eating Trends Around the World, Nielson (Jan. 2015) https://web.archive.org/web/20150421053626/https://www.nielsen.com/content/dam/nielsenglobal/eu/nielseninsights/pdfs/Nielsen%20Global%20Health%20and%20Wellness%20Report%20-%20January%202015.pdf.

food products reached $1 trillion in 2017, according to Euromonitor, means consumers are eager and willing to pay more for food advertised and labeled as having "No Preservatives."[20]

48. Defendant's practice of capitalizing on consumers' preferences for healthier products is false and deceptive. This deception continues today, as consumers continue to purchase the Products under the mistaken belief that they are free from preservatives based on Defendant's false, deceptive, and misleading labeling and advertising of the Product as having "No Preservatives."

49. Plaintiff and other consumers of the Products made their purchase decisions in reliance upon Defendant's advertised claims that that Product contains "No Preservatives."

50. Plaintiff and the Class reasonably and detrimentally relied upon the representations by Defendant that the Products contain "No Preservatives." Plaintiff and the Class would not have purchased the Products had they known that the Products contain a synthetic preservative.

51. Defendant's conduct threatens consumers by using intentionally deceptive and misleading labels. Defendant's conduct also threatens other companies, large and small, who "play by the rules." Defendant's conduct stifles competition and has a negative impact on the marketplace, and reduces consumer choice.

52. There is no practical reason for false labeling and advertising of the Products, other than to mislead consumers as to the presence of preservatives in the Products while simultaneously providing Defendant with a financial windfall.

**Plaintiff's Claims Are Not Preempted by the Federal Food, Drug, and Cosmetic Act**

53. Defendant's deceptive misrepresentations violate the Federal Food, Drug and Cosmetic Act ("FDCA"), which provides that "[a] food shall be deemed misbranded if its labeling is false or misleading in any particular." 21 U.S.C. § 343 (a)(1).

54. Plaintiff's claims are not preempted by the FDCA because the definition of "preservative" as used herein is identical with that of the FDA (see above). Moreover, FDA regulations specifically note that claims like "No Preservatives" are non-nutritive claims that are not governed by 21 C.F.R. §101.13. *See*, 21 C.F.R. § 101.65(b)(2). Since the FDA has not issued specific standards governing when "No Preservative"

---

[20] *See*, Health and Wellness the Trillion Dollar Industry in 2017: Key Research Highlights, Euromonitor International, https://web.archive.org/web/20220831234425/https://www.euromonitor.com/article/health-andwellness-the-trillion-dollar-industry-in-2017-key-research-highlights.

claims are either true or false, such representations fall outside the ambit of FDA regulations. Accordingly, Plaintiff's claim cannot possibly be preempted. *See*, Bimont v. Unilever U.S., Inc., No. 14-CV-7749 (JPO), 2015 U.S. Dist. LEXIS 119908, at *6 (S.D.N.Y. Sep. 9, 2015) ("[P]reemption does not preclude a state-law claim if the state requirement is outside the scope of the relevant federal requirements").

### Defendant's Misrepresentations Are Material to a Reasonable Consumer and Were Relied Upon by Plaintiff and the Class

55. Plaintiff and Class members reasonably relied on Defendant's representations that the Products are free of preservatives.

56. Defendant's misrepresentations are misleading and deceive reasonable consumers. At the point of sale, Plaintiff and Class members did not know, and had no reason to know, that the Products were misbranded as set forth herein. A representation that a product has "no preservatives" is material to a reasonable consumer when deciding to purchase it. Plaintiff did, and a reasonable consumer would, attach importance to whether Defendant's Products have "no preservatives" because it is common knowledge that consumers prefer to avoid foods with potentially unhealthy additives.

### Defendant Has an Intent to Mislead

57. Defendant would not include the representations regarding the Products if these representations would not influence consumer behavior.

58. By representing that the Products have "No Preservatives," Defendant seeks to capitalize on consumers' preference for less processed foods with fewer unhealthy additives and the association between such products and a wholesome way of life. Consumers are willing to pay more for less processed products with no unhealthy additives because of this association, as well as the perceived higher quality, health, and safety benefits associated with products labeled as being free of preservatives.

59. Alternet.org reports on research that shows that most Americans are willing to pay a premium price for healthier food options:

> Not only are consumers increasingly seeking out wholesome foods, they are willing to pay a premium for them. According to Nielsen's 2015 Global Health & Wellness Survey that polled over 30,000 people online, 88 percent of Americans are willing to pay more for healthier foods. Global sales of healthy food products are estimated to reach $1 trillion by 2017, according to Euromonitor. When it comes to what consumers will be seeking out more of over the coming year, it may amount to single word. "Just think of the word no," Seifer said. "No preservatives, no additives, no growth hormones."[21]

---

[21] http://www.alternet.org/food/8-food-trends-watch-2016.

60. Defendant has a natural interest in misrepresenting its Products as free of preservatives given these trends addressed above, despite the presence of citric acid. The Products' misrepresentations provide a clear marketing advantage over competitors that do not engage in such deceptive conduct.

61. Defendant knows that its "No Preservatives" representations regarding the Products are false and intend that they be relied upon by Plaintiff and the Class.

**Plaintiff and the Class Were Injured as The Result of Defendants' Deceptive Practices**

62. Plaintiff and the Class were injured when Defendant denied them the full benefit of their bargain. They paid money for Products that were represented to them as free from preservatives, and then received Products that were laden with preservatives, which have significantly less value.

63. Plaintiff and the Class were thus deprived of the benefit of their bargain. They would not have purchased the Products, or would only have been willing to pay less for them, had they known the truth.

64. Plaintiff and the Class were injured in an amount up to the purchase price, the difference between the actual value of the Products and the value of the Products as misrepresented to them by Defendant, to be determined by expert testimony at trial.

65. Defendant's representation that the Products contain "No Preservatives" is an acknowledgment that this increases the Products' perceived value. *See*, Orlander v. Staples, Inc., 802 F.3d 289, 302 (2d Cir. 2015) ("the issue of 'price premium' was relevant because it showed that plaintiffs paid more than they would have for the good but for the deceptive practices of the defendant-sellers"); Kacocha v. Nestle Purina Petcare Co., No. 15-CV-5489 (KMK), 2016 U.S. Dist. LEXIS 107097, at *51-52 (S.D.N.Y. Aug. 11, 2016) ("[I]n his Complaint, Plaintiff seeks monetary damages on the grounds that he 'would not have paid the premium price he paid' to buy the Products had he 'known the truth.'…Case law makes clear that this is sufficient at the motion-to-dismiss phase for a § 349 claim to survive."); Koenig v. Boulder Brands, Inc., 995 F.Supp. 2d 274, 288-89 (S.D.N.Y. 2014) ("Plaintiffs claim that, but for Defendants' 'unfair and deceptive practices,' they—and the putative class—would not have purchased, or paid a price premium for, Smart Balance. Compl. ¶¶ 7, 81. Indeed, Plaintiffs claim that they paid price premiums specifically 'based on Defendants' misrepresentations,' and allege that they deserve damages in the amount of either the purchase prices, or the price premiums that they paid for Smart Balance. Id. ¶ 81. Accordingly, the Court finds that Plaintiffs have adequately alleged injury under GBL § 349…").

## CLASS ALLEGATIONS

66. Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

67. Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated individuals within the United States (the "Class" or the "Nationwide Class"), defined as follows:

> All persons in the United States who purchased the Products during the applicable limitations period (the "Class Period"). Excluded from the Class are Defendant's officers and directors; members of the immediate families of Defendant's officers and directors; Defendant's legal representatives, heirs, successors, or assigns; and any entity in which they have or have had a controlling interest.

68. Additionally, Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated New York Citizens (the "New York Subclass"), defined as follows:

> All New York residents who purchased the Products in New York during the Class Period. Excluded from the Class are Defendant's officers and directors; members of the immediate families of Defendant's officers and directors; Defendant's legal representatives, heirs, successors, or assigns; and any entity in which they have or have had a controlling interest.

69. Upon information and belief, the scope of the Class and Subclass definitions, including temporal scope, may be further refined after discovery of Defendant's and/or third party records.

70. The Class and the New York Subclass will be referred to collectively throughout the Complaint as the "Class."

71. All members of the Class were and are similarly affected by the deceptive advertising of the Defendant, and the relief sought herein is for the benefit of Plaintiff and members of the Class.

72. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

73. **Numerosity – Federal Rule of Civil Procedure 23(a)(l).** At this time, Plaintiff does not know the exact number of the Class and Subclass members. Based on the annual sales and popularity of the Products, it is readily apparent that the number of consumers in the Class is so large as to make joinder impracticable, if not impossible. Class Members may be notified of the pendency of this action by recognized,

Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

74. **Commonality and Predominance –Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

   (a) whether Defendant misrepresented and/or failed to disclose material facts concerning the falsely labeled Products;

   (b) whether Defendant's conduct was unfair, misleading and/or deceptive; and

   (c) whether Defendant breached an express warranty created through the labeling and marketing of its falsely labeled Products;

   (d) whether, as a result of Defendant's misconduct as alleged herein, Plaintiff and the Class suffered an ascertainable loss; and

   (e) Whether Defendant was unjustly enriched at the expense of the Plaintiff and Class Members.

75. With respect to the New York Subclass, additional questions of law and fact common to the members that predominate over questions that may affect individual members include:

   (a) whether, in violation of § 349 of the New York General Business Law ("GBL"), Defendant engaged in deceptive acts or practices; and

   (b) whether, in violation of GBL § 350, Defendant engaged in false advertising.

76. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself, and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

77. Plaintiff's claims are typical of the claims of the Nationwide Class. Plaintiff is a member of a well-defined class of similarly situated persons and the members of the Nationwide Class were similarly affected by Defendant's conduct and are owed the same relief, as alleged in this Complaint. Members of the Nationwide Class are ascertainable from Plaintiff's description of the class, Defendant's records, and records of third parties accessible through discovery.

78. Plaintiff's claims are typical of the claims of the New York Subclass. Plaintiff is a member of a well-defined class of similarly situated persons and the members of the New York Subclass were similarly affected by Defendant's conduct and are owed the same relief, as alleged in this Complaint. Members of the New York Subclass are ascertainable from Plaintiff's description of the class, Defendant's records, and records

of third parties accessible through discovery.

79. **Adequacy of Representation - Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, and she has retained counsel competent and experienced in both consumer protection and class action litigation. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the Class. Undersigned counsel has represented consumers in a variety of actions where they have sought to protect consumers from fraudulent and deceptive practices.

80. **Insufficiency of Separate Actions - Federal Rule of Civil Procedure 23(b)(l).** Absent a representative class action, members of the Class would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. The proposed Class thus satisfies the requirements of Fed. R. Civ. P. 23(b)(l).

81. **Predominance and Superiority of Class Action.** The prerequisites to maintaining a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) are met because questions of law and fact common to each Class member predominates over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

82. Individual joinder of the Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual Class members. Each Class member has been damaged and is entitled to recovery as a result of the violations alleged herein.

83. Moreover, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class action treatment will allow those persons similarly situated to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

84. Defendant's conduct is generally applicable to the Class and the New York Subclass as a whole and Plaintiff seeks, inter alia, equitable remedies with respect to the Class and the New York Subclass as a whole. As such, Defendant's systematic policies and practices make declaratory relief with respect to the Class and the New York Subclass as a whole appropriate.

85. Plaintiff is unaware of any difficulties in managing this case that should preclude class action.

## CAUSES OF ACTION
### COUNT I

**Violation of New York General Business Law § 349**
**(On Behalf of the New York Sub-Class)**

86. Plaintiff incorporates by reference all the allegations of the preceding paragraphs of this Complaint.

87. New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

88. The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the New York Subclass Members seek monetary damages, compensatory damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

89. There is no adequate remedy at law.

90. Defendant misleadingly, inaccurately, and deceptively presented its Products to consumers.

91. Defendant's improper consumer-oriented conduct—including advertising the Products as containing "No Preservatives"—is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase and pay a premium for Defendant's Products and to use the Products when they otherwise would not have. Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

92. Plaintiff and the New York Subclass Members have been injured inasmuch as they paid a premium for Products that were—contrary to Defendant's representations—not free from preservatives. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

93. Defendant's advertising, including online advertising, and the Products' packaging and labeling induced the Plaintiff and the New York Subclass Members to buy Defendant's Products and to pay a premium price for them.

94. Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Sub-Class Members have been damaged thereby.

95. As a result of Defendant's recurring, unlawful deceptive acts and practices, Plaintiff and the New York Sub-Class Members are entitled to monetary, compensatory, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

THEREFORE, Plaintiff prays for relief as set forth below.

## COUNT II

### Violation of the New York General Business Law § 350
### (On Behalf of the New York Sub-Class)

96. Plaintiff incorporates by reference all the allegations of the preceding paragraphs of this Complaint.

97. The acts of Defendant, as described above, and each of them, constitute unlawful, deceptive and fraudulent business acts and practices.

98. New York General Business Law § 350 provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

99. GBL § 350-a defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

100. Plaintiff and the members of the New York Subclass are consumers who purchased the Products in New York.

101. As sellers of goods to the consuming public, Defendant is engaged in the conduct of business, trade, or commerce within the intended ambit of GBL § 350.

102. Defendant's representations made by statement, word, design, device, sound, or any combination thereof, and also the extent to which Defendant's advertising fails to reveal material facts with respect to the Products, as described above, constitute false advertising in violation of the New York General Business Law.

103. Defendant's false advertising was knowing and intentional.

104. Defendant's actions led to direct, foreseeable and proximate injury to Plaintiff and the New York Subclass.

105. As a consequence of Defendant's deceptive marketing scheme, Plaintiff and the other members of the New York Subclass suffered an ascertainable loss, insofar as they would not have purchased the Products had the truth been known, or would have purchased the Products on different terms, or would otherwise purchase a competing product, and as a result of Defendant's conduct, they received products of less value than what they paid for.

106. By reason of the foregoing, Defendant is liable to Plaintiff and the other members of the New York Subclass for actual damages, injunctive relief, attorneys' fees, and the costs of this suit.

THEREFORE, Plaintiff prays for relief as set forth below.

## COUNT III

### Breach of Express Warranty
### (On Behalf of the Class)

107. Plaintiff incorporates by reference all the allegations of the preceding paragraphs of this Complaint.

108. Defendant provided Plaintiff and other members of the Class with written express warranties including, but not limited to, warranties that its falsely labeled Products contained "No Preservatives."

109. These affirmations of fact or promises by Defendant relate to the goods and became part of the basis of the bargain.

110. Plaintiff and members of the Class purchased the falsely labeled Products believing them to conform to the express warranties.

111. Defendant breached these warranties. This breach resulted in damages to Plaintiff and other members of the Class, who bought the falsely labeled Products but did not receive the goods as warranted.

112. Plaintiff and the members of the Class performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

113. Plaintiff, on behalf of herself and the Class, provided Defendant with pre-suit notice of its breach of the express warranties with respect to the advertising of the Products.

114. By providing pre-suit notice, Plaintiff has effectively notified the Defendant of the troublesome nature of its transactions within a reasonable time of discovering the breach.

115. Despite providing the above notice to the Defendant that the Products do not meet Defendant's warranties and in fact fail in many respects to perform consistent with the Products' representations, Defendant continues to hide the facts from consumers and fails to correct the material misrepresentations regarding the Products.

116. Actual and/or constructive notice was duly given to Defendant of the breaches of these warranties, and Defendant has yet failed to cure.

117. As a proximate result of the breach of warranties by Defendant, Plaintiff and the other members of the Class did not receive goods as warranted. Plaintiff and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial. Among other things, Plaintiff and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above. Moreover, had Plaintiff and the Class members known the true facts, they would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price Defendant charged for the products.

THEREFORE, Plaintiff prays for relief as set forth below.

## COUNT IV
### Unjust Enrichment
### (On Behalf of the Class)

118. Plaintiff brings this claim individually and on behalf of members of the Class as an alternative to her Express Warranty Claim.

119. Plaintiff and the Class conferred a benefit on Defendant by purchasing the Products.

120. As set forth above, Defendant engaged in fraudulent conduct that misrepresented the Products as containing "no preservatives."

121. As a result of Defendant's deceptive, fraudulent, and misleading labeling, advertising, marketing, and sales of its Products, Defendant was enriched, at the expense of Plaintiff and the Class members, through the payment of the purchase price for Defendant's Products.

122. Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits that they received from Plaintiff and the Class members in light of the fact that the Products purchased by Plaintiff and the Class members were not what Defendant purported them to be.

Thus, it would be unjust or inequitable for Defendant to retain the benefit without restitution to Plaintiff and the Class members for the monies paid to Defendant for the Products.

123. By reason of the foregoing, Plaintiff and Class members are entitled to their actual damages in an amount to be determined at trial, with interest thereon, and disgorgement of all amounts by which Defendant has been unjustly enriched.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment on behalf of herself, the Nationwide Class and the New York Subclass, providing such relief as follows:

A. An order certifying the proposed Nationwide Class and the New York Subclass; appointing Plaintiff as representative of the Nationwide Class; appointing Plaintiff as representative of the New York Subclass; and appointing Plaintiff's undersigned counsel as Class counsel for the Class and Subclass;

B. A declaration that Defendant is financially responsible for notifying Class and Subclass members of the pendency of this suit;

C. An order requiring proper, complete, and accurate marketing and labeling of the Products;

D. An order declaring that Defendant's conduct violates the statutes and common law referenced herein;

E. An order finding in favor of the Plaintiff, the Class, and the New York Subclass on all counts asserted herein;

F. An order awarding compensatory, treble, and punitive damages in amounts to be determined by the Court and/or jury;

G. An order disgorging all amounts by which Defendant has been unjustly enriched;

H. An order awarding pre-judgment and post-judgment interest on all amounts awarded;

I. An order of restitution and all other forms of equitable monetary relief;

J. Declaratory and injunctive relief as pleaded or as the Court may deem proper;

K. An order awarding Plaintiff, the Class, and New York Subclass their reasonable attorneys' fees and expenses and costs of suit; and

L.     An order awarding such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury. Plaintiff also respectfully requests leave to amend this Complaint to conform to the evidence, if such amendment is needed for trial.

DATED: March 5, 2025

                                             GABRIELLI LEVITT LLP

                                             Michael J. Gabrielli (MG-2421)
                                             michael@gabriellilaw.com
                                             2426 Eastchester Rd., Ste. 201
                                             Bronx, New York 10469
                                             Telephone: (718) 708-5322
                                             Facsimile: (718) 708-5966


                                             *Counsel for Plaintiff and the Proposed Class*